Michael W. Zimmerman (027442)
**ZWILLINGER GREEK & KNECHT PC**
2425 E. Camelback Road, Suite 600
Phoenix, Arizona 85016
TEL: (602) 224-7888
FAX: (602) 224-7889
E-mail: docket@zglawgroup.com
*Attorneys for Rita Gail Edwards*

and

Kyle Seedorf
**Taylor Anderson, LLP**
1670 Broadway, Suite 900
Denver, CO 80202
Phone: 303-551-6653
Facsimile: 720-473-5980
Email: kseedorf@talawfirm.com
*Attorneys for Defendant College Assist*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| In re:<br><br>RITA GAIL EDWARDS,<br><br>Debtor. | Chapter 7<br><br>Case No. 3:14-bk-16806-PS<br><br>Adv. Pro No. 3:15-ap-00026-PS |
| RITA GAIL EDWARDS,<br><br>Plaintiff,<br><br>v.<br><br>COLLEGE ASSIST,<br><br>Defendant. | **JOINT PRE-TRIAL STATEMENT** |

Pursuant to Local Rule 7016-1 for the United States Bankruptcy Court in the District of Arizona, Plaintiff, Rita Gail Edwards ("Ms. Edwards"), by and through her counsel, and Defendant College Assist ("Defendant"), by and though its counsel, hereby submit their joint

statement for the trial scheduled to commence on ___________, 2016, as follows:

## I. BRIEF STATEMENT OF THE NATURE OF THE CASE

This case seeks to determine the dischargeability of Plaintiff's $243,506.35 of student loans (the "Student Loans"). Plaintiff alleges that accepting the Student Loans from Plaintiff's discharge will cause an undue hardship on her and her family. Therefore, Plaintiff seeks a full discharge of the Student Loans, or in the alternative, a partial discharge of a portion of the Student Loans, pursuant to 11 U.S.C. § 523(a)(8).[1]

Defendant alleges that accepting the subject student loan debt from discharge will not impose an undue hardship on Plaintiff and her dependents. Accordingly, Plaintiff is not entitled to a discharge of the Student Loans in whole or in part under 11 U.S.C. § 523(a)(8).

## II. UNCONTESTED MATERIAL FACTS

This adversary proceeding seeks to determine whether Plaintiff's Student Loans are dischargeable under § 523(a)(8). The following facts are uncontested:

### A. Plaintiff's Student Loan Debt

Plaintiff agrees that for the sole purposes of this trial, determining whether the Student Loans are dischargeable under § 523(a)(8), that as December 11, 2015, Plaintiff's Student Loans owed to Plaintiff will be $243,506.35.[2] The Student Loans accrue interest at a rate of 6.375%.

### B. Plaintiff's Education

During the years 1990-2002, Ms. Edwards used student loans to pay educational and some living expenses related to three degrees from Ottawa University. In 1996, Ms. Edwards earned a B.A. degree in Secondary Education. In 2000, she earned a Master of Education degree. And in 2002, she earned a Master of Professional Counseling degree. Ms. Edwards is

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure.

[2] If necessary, Ms. Edwards reserves the right to challenge the validity how the sum total of the Student Loans was calculated and the legitimacy of various penalty charges that may have been included in the Student Loans. But those issues are not before the Court in this Adversary Proceeding.

a licensed independent substance abuse counselor and a licensed professional counselor. Her Arizona teaching certificate expired in 2012.

**C. Plaintiff's Family**

Ms. Edwards is a single, 56 year-old woman. She lives in a 672 square foot manufactured home located in Cornville, Arizona, and she has two children: Regina, a 34 year-old woman who lives in Cottonwood, Arizona; and Asia, a 31 year-old transwoman. Ms. Edwards' first husband, the father of her two children, died in 1990. Since 1990, Ms. Edwards has remarried and divorced twice, but she receives no spousal support.

**D. Plaintiff's Income and Work History**

From 1996 until 2005, Ms. Edwards worked full-time in different Arizona public schools. In 1997 she co-founded a charter school in Cottonwood, Arizona, that specialized in serving at-risk youth in grades 6 to 12. In 2000, she founded a smaller charter school in Cottonwood, Arizona, that served the same student population in grades 6 to 12. Enrollment at these charter schools did not support the operational expenses and therefore both schools closed.

In 2005, Ms. Edwards began working at TASC (Treatment Assessment Screening Center) in Cottonwood, Arizona, where she earned approximately $16 per hour. She worked at TASC until 2007. During the second half of 2007 and through the first quarter of 2008, Ms. Edwards worked as a Guidance Counselor for the Arizona Department of Corrections where she earned $25 per hour.

For part of 2008, Ms. Edwards worked three separate part-time jobs each in the clinical, counseling field. During the last quarter of 2008, Ms. Edwards worked a single job as an Intensive Outpatient Therapist at Aurora Health Hospital in Glendale, Arizona, and earned approximately $28 per hour. Her husband at that time worked as an electrician.

In 2009, Ms. Edwards was laid off by Aurora Health Hospital and her spouse lost his job too. Their home in Glendale, Arizona was foreclosed upon in 2009 because they could not make payments. Ms. Edwards and her spouse at the time lived in a 1986 5th Wheel Trailer for more than two (2) years—until she purchased her current residence in April, 2011—a 672

square foot manufactured home in Cornville, Arizona.

In 2009, Ms. Edwards opened SET Counseling as a sole-proprietor in Prescott Valley, Arizona. She is an approved counseling service provider for persons seeking court-mandated counseling services related to DUI Screening, DUI Education, DUI Treatment, Domestic Violence Treatment, Anger Management, and Substance Abuse Education / Drug Diversion. Her income varies each month depending upon the number of people who are required and who elect to employ her counseling services. According to her tax returns, Ms. Edwards' net income over the past five years has been as follows:

| | Year | Net Income |
|---|---|---|
| | 2010 | $26,625.00 |
| | 2011 | $15,972.00 |
| | 2012 | $20,227.00 |
| | 2013 | $ 7,327.00 |
| | 2014 | $ 638.00 |
| Average Annual Net Income: | | $14,157.80 |

**E. Plaintiff's Expenses**

For the past six months, Ms. Edwards' gross monthly income averaged approximately $2,840. Her average monthly household expenses, including assistance provided to her children, totals approximately $2,504. Ms. Edwards claims the following as her regular, current expenses:

| Item | Current |
|---|---|
| Mortgage | $ 494 |
| Home Maintenance | $ 150 |
| Electric | $ 160 |
| Water/Sewer | $ 60 |
| Telephone/Internet | $ 58 |
| Food | $ 375 |
| Clothing / Laundry | $ 50 |
| Personal Care Products | $ 50 |
| Medical/Dental | $ 275 |
| Transportation | $ 150 |

| | |
|---|---|
| Car Payments | $ 403[3] |
| Recreation | $ 50 |
| Auto Insurance | $ 52 |
| Term Insurance | $ 27 |
| IRS Tax Payment[4] | $ 15 |
| **TOTAL** | **$2,504** |

**F. Plaintiff's Student Loan Repayment History**

In 2006, Ms. Edwards consolidated her student loan debt. The Student Loans were consolidated in two groups, "Group C" and "Group D." At various times after her student loan consolidation in 2006, Ms. Edwards requested to forbear making any payments. Ms. Edwards also made the following payments on her Student Loans: In 2011, Ms. Edwards made at least four payments totaling $143.47; in 2012, Ms. Edwards made at least nine payments totaling $201.39; in 2013, Ms. Edwards made at least thirteen payments totaling $333.40; and in 2014, Ms. Edwards made at least seven payments totaling $179.62.

Ms. Edwards submitted applications to participate in the IBR program while the Student Loans were serviced by Nelnet Education Planning & Financing ("Nelnet"). After 25 years of repayment under the IBR program, Plaintiff's remaining debt on the Student Loans would have been discharged. Any debt forgiven under the IBR program qualifies as cancellation of debt income.

By way of further clarification of the payments referenced above, as part of the IBR program, during the months of November 2011 through March 2012, Ms. Edwards made monthly payments of $15.93: $6.77 for the Group C loan and $9.16 for the Group D loan. During the months of September 2012 through March 2013, as part of the IBR Ms. Edwards' electronically paid Nelnet $25.60 at least once each month: $10.50 for the Group C loan and $15.10 for the Group D loan. From May 2013 through May 2014, Ms. Edwards paid Nelnet

---

[3] Ms. Edwards recently purchased a more reliable used car—a 2006 Toyota Corolla with 115,000 miles, financed with two loans: one loan requires payments of $250 per month for 20 months; the second loan requires payments of $153 per month for 23 months.

[4] The IRS claims it is owed at least $10,689 in back taxes. Ms. Edwards recently agreed to start paying the IRS $150 each month to reduce the IRS' tax claim.

$25.66 at least once each month.

### G. Plaintiff's Bankruptcy

On November 10, 2014, Ms. Edwards filed for bankruptcy relief under chapter 7 of the Bankruptcy Code. Ms. Edward filed this adversary on January 12, 2015.

## III. CONTESTED ISSUES OF FACT

Matters identified below represent factual issues that are contested, insofar as the parties have not stipulated to the accuracy and/or materiality or relevance of the facts, or one party views the assertions as potentially misleading.

1. Whether Plaintiff has maximized her income.
2. Whether Plaintiff has minimized her expenses.
3. Whether Plaintiff currently maintains a minimal standard of living.
4. Whether there are "additional circumstances" likely to persist.
5. Whether Plaintiff has made good faith efforts to repay the loan, including but not limited to as it relates to her willingness to consider and pursue repayment options available to her.

### A. Plaintiff's Facts, Contested by Defendant[5]

Ms. Edwards is a responsible, self-reliant woman and she has spent her life helping and educating others in need. In her professional life, Ms. Edwards provides an important service to her community—she counsels and supports individuals seeking court-mandated counseling services related to DUI Screening, DUI Education, DUI Treatment, Domestic Violence Treatment, Anger Management, and Substance Abuse Education / Drug Diversion. She built her business from scratch and in the midst of the Great Recession while she was living in a 1986 5th Wheel Trailer. Although Ms. Edwards enjoys her work, she regularly looks for alternate jobs that might pay more. She has applied for other positions but her efforts have been unsuccessful.

[5] This section contains Plaintiff's statements of fact to which Defendant was unable to stipulate because Defendant had no knowledge of or was unable to verify the assertion, or because Defendant believes the assertion is inaccurate, immaterial and/or otherwise irrelevant, non-factual, and/or not timely disclosed.

In her home life, Ms. Edwards is the only member of her family who supports her children, both of whom rely on Ms. Edwards for support. Ms. Edwards does not have any family members that provide her with any assistance. When Ms. Edwards' husband, the father of Regina and Asia, died in 1990, the $125,000 life insurance policy that Ms. Edwards received did not last long. Regina suffers from renal failure and blindness due to Type I diabetes that presented when Regina was 13 years-old. Regina cannot work, and cannot survive on her monthly disability allowance of $844 per month. Ms. Edwards provides Regina with money for food, medications, and other necessities when her meager disability allowance is spent. And due to Regina's blindness, Ms. Edwards regularly transports Regina to and from medical appointments, the pharmacy and the grocery store. Regina's condition will persist for the rest of her life.

Asia also needs Ms. Edwards' support. Asia, a transwoman, suffers from bipolar disorder and PTSD and was recently released from the Arizona Department of Corrections. For the first time since age 14, Asia is not either locked-up, on parole or under state supervision. Asia is unemployed, receives only $190 in food stamps each month, and has lived with Ms. Edwards in Ms. Edwards' 672 square foot manufactured home since November 7, 2014. Asia is approximately 6'0" tall and weighs approximately 165 pounds; her $190 per month food stamp allowance is insufficient, thus necessitating Ms. Edwards support. Ms. Edwards' efforts to secure additional disability or other assistance for Asia have failed. Ms. Edwards will claim Asia as a dependent on her 2015 taxes. It is uncertain how long Asia will continue to rely on Ms. Edwards' support.

Ms. Edwards lives a very frugal lifestyle on her meager income, yet she has made consistent efforts to repay her Student Loans or otherwise avoid default. She has just enough to pay her expenses, which fall far below the threshold for allowable expenses in Chapter 13 cases in the District of Arizona and the IRS Guidelines for Allowable Living Expenses for Yavapai County, Arizona. But with an outstanding balance of approximately $250,000 accumulating interest at a rate of 6.375%, it is unlikely that Ms. Edwards will ever be able to repay her Student Loan debt with her educational background.

Ms. Edwards requested multiple deferrals of her Student Loans and she tried to participate in the IBR program. On or around October 24, 2013, Ms. Edwards provided her updated income information to Nelnet multiple times in an effort to continue her repayment in the IBR program. During that same time period, Ms. Edwards received notices of past due amounts from Nelnet although Ms. Edwards continued to electronically pay Nelnet $25.66 each month. In 2013 and 2014 Ms. Edwards called Nelnet customer service multiple times to resolve issues related to the default letters and the ongoing withdrawals by Nelnet from her account. Ms. Edwards was unable to resolve these issues.

In 2013 when Ms. Edwards made electronic payments of $25.66 as part of the IBR program she also received statements indicating that she was not in the IBR program and that she owed in excess of $2,165.17 per month. She called Nelnet customer service multiple times in January 2014 in an effort to resolve these issues but was unable to remedy the problems. Nonetheless, even the $25.66 paid as part of the IBR program from May 2013 through May 2014 imposed an undue hardship and might have otherwise paid for food or other necessities. Furthermore, any debt forgiven under the IBR program qualifies as cancellation of debt income and thus may lead to additional tax liabilities for Ms. Edwards. Ms. Edwards is already struggling to repay her past due taxes.

**B. Defendant's Facts, Contested by Plaintiff[6]**

The Student Loans at issue are made up of a consolidation loan, which was disbursed in 2006. The Student Loans are in administrative forbearance while this Adversary Proceeding is pending. Prior to filing bankruptcy, the Student Loans were in repayment under the income based repayment ("IBR") program. Her payment obligations in the IBR program for 2013, the most recent year she was actively participating in repayment in the program, totaled $25.60 per month. Beginning in 2014, the payment obligation would have been $10.00 per month.

By way of further background, the Student Loans were consolidated in two groups, and the payment obligation under IBR was modified based on changes in Plaintiff's income.

---

[6] This section contains Defendant's statements of fact to which Plaintiff was unable or unwilling to stipulate.

Because the IBR program requires annual income updates, the payment obligation is subject to some modification annually. The 12-month payment obligation under IBR for "Group C" loans in 2014 would have been $3.96 per month, while the 12-month payment obligation for "Group D" loans in 2014 would have been $6.04 per month. In the preceding period, those payments were $10.50 and $15.10 per month, respectively, for a total monthly payment obligation of $25.60.

## IV. STIPULATED ISSUES OF LAW

Both parties agree that the *Brunner* "undue hardship" analysis, as adopted by the Ninth Circuit Court of Appeals in *In re Pena* is the present standard this court should use to determine whether Plaintiff has met her burden to discharge her Student Loans. Under § 523(a)(8), student loans are generally excepted from discharge unless repayment would constitute "an undue hardship for Debtor and Debtor's dependents." The Bankruptcy Code does not define "undue hardship."

The test to determine if repayment of student loans would cause an undue hardship on the Debtor and the Debtor's dependents requires that the Plaintiff demonstrate the following:

a. the debtor cannot maintain, based on current income and expenses, a minimal standard of living if forced to repay the student loans;
b. additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period; and
c. the debtor has made good faith efforts to repay the student loans. *Brunner v. N.Y. State Higher Educ. Servic. Corp. (Brunner)*, 46 B.R. 752 (S.D.N.Y. 1985), *aff'd*, 831 F.2d 395 (2d Cir. 1987); *United Student Aid Funds, Inc. v. Pena (In re Pena),* 155 F.3d 1108 (9th Cir. 1998).

Plaintiff bears the burden of proving each of these elements by a preponderance of the evidence—not absolute certainty—that she meets these requirements. *Carnduff v. United States (In re Carnduff)*, 367 B.R. 120, 128-29 (9th Cir. BAP 2007) ("Even though this language could be interpreted to require absolute certainty that a debtor's financial situation will not improve, this is not so.").

The first prong of the *Brunner* test requires the court to consider whether it would be "unconscionable to require the debtor to take steps to earn more income or reduce her expenses" to make payments under a given repayment schedule. *Penn. Higher Educ. Asst. Agency v. Birrane (In re Birrane)*, 287 B.R. 490, 495 (9th Cir. BAP 2002) (*internal quotations omitted*).

For the second prong of the *Brunner* test, the 9th Circuit provided a non-exhaustive list of "additional circumstances" that a trial court might use to decide if the debtor's present state of affairs is likely to persist for a significant portion of the repayment period that make future repayment impossible. *Educ. Credit Mgmt. Corp. v. Nys (In re Nys)*, 308 B.R. 436, 444 (9th Cir. BAP 2004), *aff'd* 446 F.3d 938 (9th Cir. 2006). The non-exhaustive list of factors the court may consider include: 1) serious mental or physical disability of the debtor or her dependents which prevents employment or advancement; 2) debtor's obligations to care for dependents; 3) lack of, or severely limited education; 4) poor quality of education; 5) lack of useable or marketable job skills; 6) underemployment; 7) maximized income potential in the chosen educational field, and no other more lucrative job skills; 8) limited number of years remaining in the debtor's work life to allow payment of the loan; 9) age or other factors that prevent retraining or relocation as a means for repayment of the loan; 10) lack of assets which could be used to pay the loan; 11) potentially increasing expenses that outweigh any potential application of the value of the debtor's assets and/or likely increases in the debtor's income; 12) lack of better financial options elsewhere. *In re Nys*, 446 F.3d at 947 (9th Cir. 2006).

The third prong of the *Brunner* test analyzes the debtor's efforts to maximize income, minimize expenses, and negotiate workable repayment options. *Educ. Credit Mgm't Corp. v. Jorgensen (In re Jorgensen)*, 479 B.R. 79, 89 (9th Cir. BAP 2012).

## V. CONTESTED ISSUES OF LAW

### A. **Plaintiff's Position: The Court Should Grant Plaintiff an Undue Hardship Discharge of Her Student Loans Which Total Nearly $250,000.**

Forcing Ms. Edwards to repay any or all of her Student Loans, approximately $243,506.35 as of December 11, 2015, will impose an undue hardship on her and her family.

Ms. Edwards will demonstrate that under the *Brunner* test, if the Student Loans are not discharged, she cannot maintain a minimal standard of living for herself and her family; additional circumstances in her life are likely to persist for a substantial portion of the loan repayment period; and she has made a good faith effort to repay her Student Loans.[7]

**a. Ms. Edwards cannot maintain a minimal standard of living for herself and her dependent child if forced to repay her Student Loans.**

To satisfy the first prong the *Brunner* test, the Court must find that it would be "unconscionable to require the debtor to take steps to earn more income or reduce her expenses" in order to make payments under a given repayment schedule. *In re Birrane*, 287 B.R. at 495 (9th Cir. BAP 2002) (*citation omitted*). To determine whether the debtor can maintain a minimal standard of living, the Court "must review the income and expenses of the debtor at the time of trial" such as pay stubs, tax returns, debtor's statements and schedules, and her testimony. *Cota v. United States (In re Cota)*, 298 B.R. 408, 414-15 (D. Ariz. 2003) (*mem.*) (*citing In re Pena*, 155 F.3d at 1113). The Court may use the IRS National Standards or the Chapter 13 trustee guidelines as a benchmark for determining whether a debtor's expenses are reasonable. *Cota v. United States (In re Cota)*, 298 B.R. 408, 414-5 (D. Ariz. 2003) (*mem.*) (*citing In re Pena*, 155 F.3d at 1113); *see also In re Greenwood*, 349 B.R. 795, 801 (Bankr. D. Ariz. 2006) (*mem.*). Satisfying the burden of proof of the first prong of the *Brunner* test requires "more than a showing of tight finances," but stops well short of "utter

---

[7] The Court is not limited by the outdated strictures of the *Brunner* test. *See Krieger v. Educ. Credit Mgmt. Corp.*, 713 F.3d 882, 884 (7th Cir. 2013) (According to Judge Easterbrook, "[t]he statutory language is that a discharge is possible when payment would cause an "undue hardship." It is important not to allow judicial glosses, such as the language in . . . *Brunner*, to supersede the statute itself."). Accordingly, the Ninth Circuit Bankruptcy Appellate Panel recently invited the Ninth Circuit to revise the "undue hardship" test adopted by the Ninth Circuit in 1998 in *Pena*, 155 F.3d 1108 (9th Cir. 1998). *See Roth v. Educ. Credit Mgm't Corp. (Roth)*, 490 B.R. 908, 920 (9th Cir. BAP 2013) (concurring opinion) ("However, because I understand how the bankruptcy court felt restricted by precedent in reaching its decision, I write separately to highlight that the analysis required by *Pena/Brunner* to determine the existence of an undue hardship is too narrow, no longer reflects reality, and should be revised by the Ninth Circuit when it has the opportunity to do so.").

hopelessness." *In re Nascimento*, 241 B.R. 440, 445 (9th Cir. BAP 1999).

"Debtors do not have to live at or below the official poverty guidelines to meet the first prong of the *Brunner* test." *Id. citing Ed. Credit Mgmt. Corp. v. Howe (In re Howe),* 319 B.R. 886, 889 (9th Cir. BAP 2005). For example, the Ninth Circuit found that a debtor met the first prong of the *Brunner* test when she owed $69,000 in student loans and earned a gross annual salary of $27,591.36 and had one child, which resulted in monthly expenses of $1,897 compared to a net monthly salary of $1,898. *Rifino v. United States (In re Rifino),* 245 F.3d 1083, 1085-86 (9th Cir. 2001). Similarly, the following net monthly income compared to average monthly expense ratios were found to have satisfied the first prong of the *Brunner* test:

| Income | : | Expense | Case |
|---|---|---|---|
| $1,748 | : | $1,789 | *In re Pena*, 155 F.3d at1113; |
| $ 400 | : | $ 0 | *In re Birrane*, 287 B.R. at 495; |
| $1,000 | : | $1,300 | *In re Mason*, 464 F.3d 878, 882 (9th Cir. 2006). |

In *Birrane*, the first prong of the *Brunner* test was met even where the debtor's budget included an allowance for the purchase of a new car. *In re Birrane*, 287 B.R. at 496.

By contrast, courts have found that the first prong of the *Brunner* test was not satisfied when: a debtor was voluntarily unemployed and had no dependents (*Ed. Credit Mgmt. Corp. v. Rhodes (In re Rhodes),* 464 B.R. 918, 923 (D. Wash. 2012)); and when a debtor earned a comfortable living and had, among other things, monthly vehicle expenses that exceeded $500 and her student loan payments were only $265 per month. *In re Nascimento*, 241 B.R. at 445-46.

Here, Ms. Edwards is the sole provider for her family—a family that needs her support. Over the last five years, Ms. Edwards has had an average net annual income of $14,157.80. This is $1,772.20 less per year than the federal poverty guideline for a family of two; $562.20 less per year than the poverty guideline for a single person (which is inappropriate in in this case because Asia will be claimed as a dependent).[8] Asia's bi-polar disorder, extreme

[8] 26 U.S.C. § 152 (d) defines a "qualifying relative" as one who 1) bears a relationship with the taxpayer, like a child; 2) whose gross income is less than $2,000; 3) was provided more

volatility, transgender issues and PTSD following years of incarceration and alleged sexual abuse, make it very unlikely that she will find a job. Furthermore, assuming Ms. Edwards' family size is comprised of two members makes no allowance for the assistance Ms. Edwards provides her blind and disabled daughter, Regina, for necessary medications and other items that are not covered by the Regina's disability assistance.[9] And even if Ms. Edwards earned more than the federal poverty guidelines, the Court is not limited by these figures. *See, i.e., In re Howe*, 319 B.R. 889-90.

The fact is that it would be unconscionable to require Ms. Edwards to make payments on the Students Loans rather than support herself or her children. Ms. Edwards already lives an incredibly frugal lifestyle and has avoided taking any government assistance while she struggles to make ends meet. When her house was foreclosed upon, she lived in a 5th Wheel Trailer for two years. When she was laid-off in 2009, she opened her own business to generate income—while helping those struggling with addiction and other issues—DUI education and treatment, domestic violence treatment, anger management, substance abuse education and drug diversion. At times, she has operated multiple offices in an effort to increase her earnings, but overhead costs equaled her additional earnings. Therefore, she has committed herself to work as much as possible in a single location. But, she earns just enough income to scrape by notwithstanding her Student Loans. *See In re Nys*, 446 F.3d at 944 (9th Cir. 2006) ("[F]orcing debtors who cannot reasonably be expected to increase their future income to make payments on their student loans when it causes them to fall below a minimum standard of living constitutes an 'undue hardship.'").

Ms. Edwards lives in a 672 square foot manufactured home with Asia and has no extravagant or recreational spending. Any supplemental income that she may have at the end of a month is used to keep support Asia, keep Asia off the streets, and to help Regina with

---

than half of their support by the claimant taxpayer; and 4) is not also being claimed as a qualifying child of the taxpayer (which is restricted by the age of the child).

[9] The poverty guideline for a family of two is $15,930 per year, and $14,720 for a single person according to the federal poverty guidelines available at http://aspe.hhs.gov/poverty-guidelines.

medications or food that is not covered by her disability assistance. Forcing Ms. Edwards to pay any amount towards the Student Loans will eliminate her ability to support her children—Regina may suffer without necessary medications or she might go hungry; Asia might end up incarcerated again or on the street. In sum, Ms. Edwards is a self-reliant, hard-working individual that has committed herself to helping others, not just her immediate family. She has done all she can to maximize her income and reduce her expenses. Ms. Edwards will be unable to maintain a minimal standard of living for herself of or her dependent child if she is forced to repay the Student Loans.

**b. Additional permanent circumstances weigh heavily in favor of including the Student Loans in Ms. Edwards' bankruptcy discharge.**

Overwhelming circumstances that are likely to persist for the repayment period weigh heavily in favor of including the Student Loans in Ms. Edwards' bankruptcy discharge. *See In re Nys*, 446 F.3d at 944 (9th Cir. 2006) (see the list of additional circumstances provided above). The "additional circumstances" need not be exceptional circumstances, such as a serious illness, but may be "any circumstances, beyond mere current inability to pay, that show this inability to pay is likely to persist for a significant portion of the loan repayment period." *In re Nys*, 308 B.R. at 444 (9th Cir. BAP 2004); *see also In re Mason*, 315 B.R. 554, 562 (9th Cir. BAP 2004).

In this case, Ms. Edwards' exceptional circumstances make it very unlikely that she will ever be able to repay approximately $250,000 of Student Loans. Ms. Edwards handles seemly insurmountable challenges with grace and dedication. She cares for her children despite their serious mental and physical disabilities while serving as a court approved counselor to help others. Ms. Edwards' dependent, Asia, is diagnosed with severe bi-polar disorder and suffers from PTSD after years of incarceration and alleged sexual abuse. As Asia's only supporting family member, Ms. Edwards is morally obligated to house Asia because Asia was denied disability assistance, and Asia (standing approximately 6'0" and weighing approximately 165 pounds) cannot live on her $190 food stamp allowance. And although Regina, Ms. Edwards' other child, is not claimed as Ms. Edwards' dependent, Regina is severely disabled and suffers

from the life-threatening disease and symptoms associated with Type I Diabetes, including renal failure and blindness—Regina needs her mother's support. Regina's meager monthly disability allowance of $844 per month does not cover all of her medical or living necessities, so like any loving parent would, Ms. Edwards provides assistance whenever possible. Ms. Edwards' commitment and obligation to support both of her children is likely to remain for the duration of the Student Loan repayment period.

Ms. Edwards is 56 years-old, with degrees from Ottawa University, and was trained for work in low-paying professions focused on helping others as a secondary school teacher and a counselor. The counseling and education fields are not in high demand and are not lucrative. Degrees from Ottawa University are not highly regarded nor do they command top salaries. Ms. Edwards' Arizona teaching license expired so any teaching or counseling position in a public or private school would require additional coursework, and thus more student loans to renew her teaching certification. Ms. Edwards has used her teaching degree and her counseling degree to establish a successful counseling business that has provided her with a somewhat steady income since 2009. She has avoided going on government assistance, while supporting Asia, Regina and her many clients that rely on her for their recovery.

Relocation to another market is not an option for Ms. Edwards. Ms. Edwards established her business in Prescott Valley, Arizona. Ms. Edwards' daughter Regina is acclimated to life in Cottonwood, Arizona; and Ms. Edwards' dependent transdaugher, Asia, is far from potential trouble in Cornville, Arizona—Asia was released from parole, in part, because she lived with Ms. Edwards in an isolated small town where her social interactions are greatly reduced. Furthermore, Ms. Edwards is not required to uproot her family to satisfy her creditors. *See In re Howe*, 319 B.R. at 893. Even if relocation was an option (which it is not financially or otherwise), it is highly unlikely that Ms. Edwards could find a cheaper place to live than Cornville, Arizona, where the cost of living is very low.

In sum, Ms. Edwards struggles with a number of the "additional circumstances" in her life, thus making it unlikely that she will ever be in a position to repay approximately $250,000

of Student Loans, particularly when her average annual income over the past five years is only $14,157.80.

**c. Ms. Edwards made a good faith effort to repay her Student Loans.**

"The good faith prong of the undue hardship test focuses on two factors: a debtor's efforts to obtain employment, maximize income and minimize expenses; and the debtor's efforts to negotiate a repayment plan." *Berchtold v. Ed. Credit Mgmt. Corp. (In re Berchtold),* 328 B.R. 808, 816-17 (Bankr.D.Idaho 2005) (*mem.*) (*citing In re Mason*, 315 B.R. 554, 563 (9th Cir. BAP 2004)). Whether a debtor has made payments before filing bankruptcy is a significant factor in determining whether a debtor has made a good faith effort to repay. *Compare In re Pena*, 155 F.3d at 1114 (finding that debtors made good faith efforts to repay despite the fact that they made only a few payments, and took an $8,000 cash lump sum to purchase a car and pay other debts) with *In re Brunner*, 46 B.R. at 758 (debtor did not make a good faith effort to repay when she sought a discharge within a month of the date of her first payment without requesting forbearance or deferment). But, a lack of voluntary payments does not indicate a lack of good faith if the debtor "did not have the financial wherewithal to make them," even if the debtor admittedly had a few good earning years where some payment was possible. *In re Roth*, 490 B.R. at 908.

"A debtor's good faith can be measured by evaluating how he responded to repayment opportunities that were presented to him." *United States Dep't of Educ. v. Wallace (In re Wallace)*, 259 B.R. 170, 184 (C.D.Cal.2000); *see also Cheesman v. Tennessee Student Assistance Corp. (In re Cheesman)*, 25 F.3d 356, 360 (6th Cir.1994) (holding there was no evidence that debtors did not act in good faith despite fact that there was no evidence that they sought the less drastic remedy of a deferment before attempting to discharge their debts). Indeed, a debtor's refusal to participate in the Ford Program's Income Base Repayment or Income Contingent Repayment Program cannot be considered an indication of a lack of good faith. *See In re Roth*, 490 B.R. 908, 911, 920 (9th Cir. BAP 2013) ("Potentially disastrous tax consequences could await [the debtor's] estate and thus her heirs upon her death."); *see also In re Jorgensen*, 479 B.R. at 89 (9th Cir. BAP 2012); *In re Greenwood*, 349 B.R. at 804 ("By

making payments when he could, by timely requesting deferrals and forebearances, by attempting to maximize his income and minimize his family's expenses . . . [the debtor] has satisfied the third prong of the *Brunner* test."). And it is not bad faith if a debtor chooses a job that is not aligned with a particular degree or chooses not to secure multiple part time jobs. *See, i.e., In re Mandighomi*, 242 F. App'x 401, 403 (9th Cir. 2007).

In this case, Ms. Edwards made voluntary payments and pursued a number of options in an attempt to repay her Student Loans. In 2006, she consolidated her loans to more easily manage the notes. Many times after 2006, Ms. Edwards contacted her Student Loan service and placed the loans in forbearance or request deferral of her student loans to avoid default. Ms. Edwards failed to make payments when she absolutely could not afford to make any payments.

Since 2011, Ms. Edwards made approximately 33 payments totaling around $900. Ms. Edwards made these payments during years that her income fell far below the national poverty guideline. Ms. Edwards made these payments at times that she could not afford to do so. In fact, Ms. Edwards repeatedly submitted requests to participate in the IBR program, wrongly believing that the IBR program might provide her with a way to satisfy her Student Loans. Indeed, from May 2013 through May 2014, Ms. Edwards electronically paid Nelnet $25.66 least once each month as part of the IBR program. However, Ms. Edwards still received notices of default in 2013 and 2014. Despite Ms. Edwards' multiple calls to Nelnet customer service, she was unable to resolve these issues and received bills for $2,165.17 per month that were set to continue for term of longer than 10 years.

Ms. Edward's monthly income averaged over the past six months is approximately $2,840. It is absurd to require an IBR payment of $2,165.17, thus leaving Ms. Edwards less than $675 each month to house, feed and support herself and Asia. For Ms. Edwards, even a $10 monthly payment might require her to skip a meal or foregoing helping her children. Ms. Edwards lives frugally, and in the past chose to live in a 5th Wheel Trailer for two years because while she built her business and could not afford other housing, but she should not be required to do so again on account of the Student Loans.

d. **Partial Discharge**

Even if, *arguendo*, this Court decides Ms. Edwards cannot include all $243,506.35 of her Student Loans in her bankruptcy discharge, then Ms. Edwards is entitled to discharge most of her Student Loans. The Court has the inherent power under 11 U.S.C. § 105(a) to grant a partial discharge of student loan debt. *See, e.g. In re Saxman*, 325 F.3d 1168, 1174-75 (9th Cir. 2003). And the bankruptcy court has discretion in determining the amount and terms of payment of a partial discharge. *Bossardet v. Educ. Credit Mgmt. Corp. (Bossardet)*, 336 B.R. 451, 457 (Bankr. D. Ariz. 2005) (*mem.*) ("[C]ourts should, whenever asked to do so, examine whether there are grounds to discharge only a portion of an otherwise fully dischargeable loan."). Therefore, if the Court determines that Ms. Edwards is not entitled to include all of her student loans in her bankruptcy discharge, then the Court should allow Ms. Edwards to include nearly all of the Student Loans in her bankruptcy discharge.

**B. Defendant's Position: Plaintiff's Student Loans Should Not be Discharged Because She Cannot Prove Undue Hardship Pursuant to § 523(a)(8) and the *Brunner* Test.**

In cases under 11 U.S.C. § 523(a)(8), the burden of proving undue hardship is on the debtor, and the debtor must prove all three elements before discharge can be granted. *Educ. Credit Mgmt. Corp. v. Mason (In re Mason)*, 464 F.3d 878, 882 (9th Cir. 2006). Plaintiff cannot prove undue hardship pursuant to the statute and the three-pronged *Brunner* test, and so her loan debt should not be discharged.

Specifically, Plaintiff has not made adequate efforts to increase her income, nor has she reduced her expenses such that she could be said to be living at a minimal standard. Additionally, she can afford to satisfy her repayment obligation under the IBR program. For these reasons she cannot satisfy the first prong of the *Brunner* test.

Much of Plaintiff's argument on the *Brunner* test's second prong centers on the financial burdens associated with her decision to provide financial assistance to her adult children. To the extent Plaintiff is concerned that her daughter Asia may have difficulty finding employment on her own, such concerns are entirely speculative at this time due to

Asia's recent return from incarceration. In fact, Asia was turned down for disability support because it was determined that she could work in professions with limited personal interaction. In any event, even while assisting her adult children, Plaintiff herself is capable of working but for various reasons over the last several years she has chosen to limit her employment options. For these and other reasons, Plaintiff cannot establish "additional circumstances" suggesting her current financial situation will persist for the future.

Third, Plaintiff cannot show she has made a good faith effort to repay the debt because she has not availed herself of repayment options that would give her a monthly payment obligation she can afford, such as the IBR program under which she had a monthly payment obligation of $10 per month at the time she filed this Adversary Proceeding. She also cannot show she has made good faith efforts to maximize her income or minimize her expenses such as to improve her ability to repay her loans.

Plaintiff will not be able to establish that she meets one, much less all three, of the *Brunner* test's mandatory elements. Accordingly, her student loan debt should not be discharged.

**a. Plaintiff cannot show she is unable to maintain a minimal standard of living based on current income and expenses.**

The first prong of the *Brunner* analysis requires more than a showing of tight finances. *Levernier v. Educ. Credit Mgmt. Corp. (In re Levernier)*, 307 B.R. 684, 688 (C.D. Cal. 2004). The proper inquiry is whether it would be "unconscionable" to require the debtor to take any available steps to earn more income or to reduce her expenses. *Id.*[10]

---

[10] Notably, it is also undisputed that all family or household income must be included when assessing undue hardship. *Adler v. Educ. Credit Mgmt. Corp. (In re Adler*), 300 B.R. 740, 749 (Bankr. N.D. Cal. 2003). Here, Plaintiff concedes Asia resides with Plaintiff, but does not incorporate Asia's monthly food stamps benefit as part of her household income. Similarly, Plaintiff insists that the Court should consider Plaintiff's expenses associated with decision to provide care for her other adult child, Regina, but wants the Court to ignore Regina's income. In other words, Plaintiff is asking the Court to consider the entirety of her adult children's contributions to household expenses—regardless of whether the children are actually part of

The inquiry under the first prong also focuses on whether the debtor can, under current income and expenses, satisfy the monthly payment obligation. A debtor does not satisfy the first prong of the *Brunner* test if she fails to pursue reduced student loan payments available through income-based repayment ("IBR") options under which he would have a monthly payment obligation of as little as $0.00. *See Healy v. U.S. Dep't of Educ. (In re Healy)*, Bankruptcy No. 05-34722DM, Adversary No. 09-3033DM, 2010 WL 2650438, at *2 (N.D. Cal. June 30, 2010) (finding that the debtor did not satisfy the first prong of *Brunner* because of the availability of low or possibly no payment obligation if she had consolidated her loans and selected the IBR plan). Here, it would not be unconscionable to ask the debtor to make efforts such that she could afford her repayment under the IBR program, which was $10.00 per month at the time she filed her bankruptcy—the last date upon which she had provided income information upon which her payment obligation could be calculated. She could easily reduce her expenses on non-necessities to accommodate a $10.00 monthly payment. For example, she could reduce or eliminate the $25.00 she spends monthly on recreation, or the $27.00 she spends on term life insurance.

Additionally, Plaintiff will not be able to meet her burden of proof under the first prong of the *Brunner* analysis because the evidence at trial will show that Plaintiff has not taken steps to fully maximize her income. Specifically, Plaintiff has not made meaningful efforts to secure and maintain employment for several years. Plaintiff's diverse work background includes employment in counseling, education, retail, food service, housekeeping, clerical office work. Prior to 2009 she showed an entrepreneurial spirit, having cofounded two educational institutions as well as a counseling business. Prior to 2009, Plaintiff held jobs where she earned anywhere from $36,000.00 to $56,000.00 annually.

By contrast, since 2009 Plaintiff has chosen to operate her own business, SET Consulting, despite it providing an average annual net income of $14,157.80 over the last five years, with a one-year high of $26,625.00. Despite a history of earning much higher wages

---

the household—while ignoring their income. The *Brunner* test does not support Plaintiff's novel application of income and expenses.

working outside of SET Consulting, Plaintiff has made no meaningful effort to increase her income. In fact, since 2009 she has only applied for one job. Specifically, although Plaintiff claims she will "occasionally look around to see if there's anything out there," in the seven years from 2009 to 2015 she has applied for a grand total of one job, at Camp Verde. Edwards Dep. at 54:4-22. Moreover, despite her diverse employment history, she has never looked into working in any field other than education or counseling in the last 15 years. *Id*. at 58:4-7. She has never considered a position outside the Cottonwood/Prescott Valley area. *Id.* at 54:11-16. Plaintiff further admits that if she worked for another company, rather than being self-employed, she would not have to personally cover numerous business expenses. *Id*. at 64:13-15. To the extent Plaintiff's current employment situation and income create a hardship, it is one that is self-imposed.

Plaintiff also has failed to minimize her expenses, and routinely makes purchases that do not fall within a minimal standard of living, such as expenses for dining out, pets, term life insurance, recreation, entertainment, gifts, traveling to visit family members, and other such expenses.

In sum, Plaintiff has not maximized her income, has not minimized her expenses, and can afford payments under the IBR program. For these reasons, Plaintiff cannot satisfy her burden with regard to the first prong of the *Brunner* test.

**b. Plaintiff cannot show that "additional circumstances" exist suggesting her current state of financial affairs will persist.**

The second prong of the *Brunner* test requires the debtor to demonstrate "insurmountable barriers to the debtors' financial recovery and ability to pay." *Nys v. Educ. Credit Mgmt. Corp. (In re Nys)*, 446 F.3d 938, 946 (9th Cir. 2006). To determine whether such barriers exist, courts consider the nonexclusive list of "additional circumstances," set forth in Part IV, above. *See Educ. Credit Mgmt. Corp. v. Rhodes (In re Rhodes)*, 464 B.R. 918, 924-25 (W.D. Wash. 2012) (citing *Nys*). Often, the debtor's health is the most critical factor in this analysis. *Id*. at 925 (finding that the debtor's mental health was central to the court's conclusion on the second prong of the *Brunner* analysis).

Here, Defendant expects the great weight of the evidence on these factors to show that Plaintiff cannot prevail on the second prong. First and most importantly, Plaintiff has no mental or physical disability. Plaintiff is able-bodied and willing to work. Moreover, Plaintiff is well educated, with usable job skills.

As noted above, Plaintiff has imposed limits on the type and location of jobs she will consider. But perhaps more importantly, she has applied for a single job in the seven years from 2009 to 2015. These choices, which have necessarily limited her employment prospects, are self-imposed limitations, and as such Plaintiff cannot rely on them as a basis for discharge. *See Pa. Higher Educ. Assistance Agency v. Birrane (In re Birrane)*, 287 B.R. 490, 500 (B.A.P. 9th Cir. 2002) (acknowledging that a debtor may not willfully or negligently create his financial circumstances, but his condition "must result from factors beyond his reasonable control").

All indications are that Plaintiff is a good worker with a diverse employment background. Plaintiff has many years of work life remaining and is not beyond the ability to be retrained. She does not suffer from any physical or mental condition that affects her ability to work.

Plaintiff has identified no substantially increasing expenses for the future. In fact, her most significant current expense, her mortgage of $488 per month, will be paid off in 2021. Her IRS tax payment obligation of $150 per month also will be paid off in 2021, after a 72-month term. These two issues alone will reduce Plaintiff's future expenses by $638.00 per month, which is a reduction of more than 25% of her current expenses. Other current expenses likely will decrease when Asia leaves her household. Importantly, it is uncertain whether Asia will reside in Plaintiff's home in the future. Plaintiff herself testified that, depending upon disability income availability, Asia may move into her own low-income housing—indeed, Plaintiff testified that having Asia move out of Plaintiff's home was "the plan." Edwards Dep. at 12:19-13:2. Additionally, Asia's employability is uncertain due to her recent emergence from incarceration, and to assume Asia will be forever unemployable and/or a burden on Plaintiff would be utterly speculative.

Finally, while Plaintiff lacks assets at present with which to repay the loan, this factor is rendered immaterial to the extent Plaintiff could continue on an IBR plan with a payment obligation that has ranged from $10.00 to $25.60 per month. In other words, she could enter a repayment plan that would not require a stash of assets to repay.

In sum, this is not a case where there are "insurmountable barriers" to Plaintiff's financial recovery. It would be wholly speculative to presume Plaintiff has a dismal financial future based upon current circumstances. Discharging her debt based on her self-imposed and virtually non-existent efforts to secure reasonable employment, along with the voluntarily-assumed obligations and expenses of caring for her adult children, would be improper. Because Plaintiff lacks "additional circumstances" arising to "insurmountable barriers" to her ability to repay the debt, she cannot satisfy her burden with regard to the second prong of the *Brunner* test.

**c. Plaintiff has not made good faith efforts to repay the Student Loans.**

The good-faith requirement of *Brunner* fulfills the purpose behind the adoption of § 523(a)(8), which was a response to a rising incidence of consumer bankruptcies of former students motivated primarily to avoid payment of education loan debts. *United States Dep't of Educ. v. Wallace (In re Wallace)*, 259 B.R. 170, 179 (C.D. Cal. 2000) *(citing United Student Aid Funds, Inc. v. Pena (In re Pena)*, 155 F.3d 1108, 1111 (9th Cir. 1998)). To determine good faith, the court measures the debtor's efforts to obtain employment, maximize income, minimize expenses, and negotiate a repayment plan. *Educ. Credit. Mgmt. Corp. v. Jorgensen (In re Jorgensen*), 479 B.R. 79, 89 (B.A.P. 9th Cir. 2012).

A debtor's failure to pursue an IBR plan may not be dispositive on this prong, but it certainly weighs against a finding of good faith. *Warner v. Bryson (In re Warner)*, Bankruptcy No. 09-40475 EDJ, Adversary No. 09-04232 AJ, 2010 WL 3422716, at *3 (N.D. Cal. Aug. 24, 2010) ("However, even if the court were to conclude that Warner satisfied the second *Brunner* element, her failure to renegotiate her debt through Education's IBRP weighs against a finding that she has made a good faith effort to repay the debt…. The court holds that Warner fails the third prong of the *Brunner* test because she declined to pursue repayment through IBRP and

therefore has not made a good faith effort to repay her student loans."); *see also Healy*, 2010 WL 2650438, at *3 ("Because the first prong of *Pena* [applying *Brunner*] has not been satisfied, the court need not decide the third prong although Healy's failure to make any payments for over twelve years, and her failure to consider the IBR, do suggest the good faith standard of *Pena* might not have been satisfied."). Plaintiff has the ability to afford her payment obligation under the IBR program, which ranged from $10.00 to $25.60 in the two years before filing this Adversary Proceeding. Her failure to continue under that program weighs against a finding she has made a good faith effort to repay the debt.

Also, a debtor's failure to minimize her expenses before seeking a discharge of loan debt is itself evidence that she does not meet the good faith prong of the *Brunner* test. *Mason*, 464 F.3d 878 at 884. Moreover, a debtor may not willfully or negligently create her financial circumstances, but her condition "must result from factors beyond his reasonable control" to be able to demonstrate he meets the good faith prong. *See Birrane*, 287 B.R. at 500. As noted above, Plaintiff has elected to maintain employment through her own company, SET Consulting, at a significantly lower income than she has earned in the past, and she has taken virtually no action to remedy this situation, having applied for only one job since she created SET Consulting in 2009. Her failure to work toward improving her financial condition is not indicative of good faith.

Plaintiff will be unable to meet her burden of proof at trial regarding the third prong of the *Brunner* analysis, and the loan debt is not dischargeable.

**d. Partial discharge is not permitted under the Bankruptcy Code; even if permitted by the Ninth Circuit, a partial discharge cannot be granted here because Plaintiff cannot prove undue hardship.**

Defendant maintains that partial discharges of student loans are not permitted under the bankruptcy code. Section 523(a)(8) provides for the discharge of student loans; however, it contains no indication that Congress intended to allow bankruptcy courts to partially discharge student loan debt. *See* 11 U.S.C. §523(a)(8). The language of that section provides only two courses of action: either (1) the debtor cannot establish undue hardship and therefore the loan

is non-dischargeable, or (2) requiring repayment would create an undue hardship so that the loan should be discharged. *Educ. Credit Mgmt. Corp. v. Carter*, 279 B.R. 872, 876 (M.D. Ga. 2002). This language starkly contrasts with other sections of the code that provide explicit directions as to how bankruptcy courts should fashion various remedies. *Id.* In addition, although some courts have allowed for partial discharges pursuant to the equitable powers under 11 U.S.C. § 105(a), such section only allows a court to exercise its equitable powers consistent with the Bankruptcy Act. *Id.* As previously noted, unlike other sections of the Act, § 523(a)(8) does not provide alternate remedies. Accordingly, this Court should not grant a partial discharge.

Despite Defendant's position, Defendant acknowledges that the Ninth Circuit has previously permitted the partial discharge of student loan debt. *See Saxman v. Educ. Credit Mgmt. BJR Corp. (In re Saxman),* 325 F.3d 1168 (9th Cir. 2003). Significantly, however, the Ninth Circuit has held that a partial discharge can only be granted if the debtor meets the requirements of § 523(a)(8), including all the three prongs of *Brunner*. *Id.* at 1174-75. Accordingly, even if a partial discharge was permitted under the Bankruptcy Act, a partial discharge cannot be granted to Plaintiff because she will not be able to carry her burden in meeting the undue hardship requirements of § 523(a)(8), including all the three prongs of *Brunner*.

## VI. WITNESS LIST

### A. <u>Plaintiff's Witnesses</u>

a. Rita Gail Edwards
c/o Zwillinger Greek & Knecht PC
2425 E. Camelback Rd., Ste. 600
Phoenix, AZ 85016
(602) 224-7888

b. Any Witness designated by Defendant

### B. <u>Defendant's Witnesses</u>

a. Defendant submits that the burden is on Plaintiff to prove entitlement to a discharge on the ground of undue hardship within the meaning of 11 U.S.C.

§ 523(a)(8). Defendant reserves the right to cross examine Plaintiff and any other witnesses called in Plaintiff's case. Defendant may call the following witnesses:

i. Michael Eppers, College Assist Paralegal, to testify regarding Plaintiff's loans with College Assist, including loan balance, history, and repayment options.

ii. Rita Gail Edwards, Plaintiff

## VII. STATEMENT IDENTIFYING DEPOSITIONS TO BE OFFERED

The parties expect Ms. Edwards to testify live, in person, at trial, but each party reserves the right to use the August 28, 2015 Deposition of Ms. Edwards for appropriate purposes.

## VIII. ESTIMATED TIME REQUIRED FOR TRIAL

The parties estimate that trial will take one half of one day, or approximately 3 hours.

## IX. EXHIBIT LIST

The parties have exchanged lists of exhibits, but reserve all rights to contest the admissibility of any such exhibit. Any exhibit identified as stipulated, below, shall be treated as if it was individually listed on both parties' exhibit lists.

### A. Plaintiff's Exhibit List

| No. | Summary | Stip. | Obj. |
|---|---|---|---|
| 1 | Plaintiff's Bankruptcy Petition, Statements, and Schedules and Statement of Financial Affairs [Case No. 3:14-bk-16806-PS, DE # 1, 22] | X | |
| 2 | Plaintiff's Responses to Defendant College Assist's First Set of Interrogatories | X | |
| 3 | Plaintiff's Supplemental Disclosure Statement, dated September 14, 2015. | | |
| 4 | Plaintiff's Third Supplemental Disclosure Statement, dated October 16, 2015. | | |
| 5 | Ms. Edwards' resume, Exhibit 2 to Ms. Edwards' Initial Disclosure Statement | | |

| | | | |
|---|---|---|---|
| 6 | Professional Licenses (EDWARDS_0176-177; EDWARDS_0179-0182) | | |
| 7 | Authorization to Disclose Protected Health Information, Exhibit 4 to Ms. Edwards' Initial Disclosure Statement | | |
| 8 | Patent Chart Report for Regina Sebert (EDWARDS_0178) | | |
| 9 | Notice of Decision re Seth "Asia" Sebert Serious Mental Illness (EDWARDS_0160) | | |
| 10 | Disability Report – Appeal for Seth "Asia" Sebert (EDWARDS_0183-0190) | | |
| 11 | Correspondence from Tricia Ortega regarding claiming Asia as a dependent (EDWARDS_0193-0194) | | |
| 12 | Letter from IRS dated May 29, 2015 (EDWARDS_0056-0059) | | |
| 13 | IRS Installment Agreement Request (EDWARDS_0191-0192) | | |
| 14 | Social Security Statement, dated April 3, 2015, Exhibit 1 to Ms. Edwards' Initial Disclosure Statement | | |
| 15 | 2014 tax returns (EDWARDS_0001-0002) | X | |
| 16 | 2013 tax returns (EDWARDS_0003-0004) | X | |
| 17 | 2012 tax returns (EDWARDS_0005-0006) | X | |
| 18 | 2011 tax returns (EDWARDS_0007-0008) | X | |
| 19 | 2010 tax returns (EDWARDS_0009-0010) | X | |
| 20 | Ms. Edwards' Bank Account Statements (EDWARDS_0062-0159) | X | |
| 21 | IRS Guidelines for Allowable Living Expenses for Housing and Utilities for Yavapai County, Arizona, from https://www.irs.gov/pub/irs-utl/all_states_housing_standards.pdf | | |
| 22 | Trustee's Allowable Expenses for Housing, Utilities, Transportation, Health Care, and Food, Clothing and Miscellaneous from http://maney13trustee.com/wordpress/wp-content/uploads/2014/09/TrusteeExpenseGuidelines2013.pdf | | |
| 23 | Plaintiff's Income and Payments Summary | | |
| 24 | 2014 Residential Notice of Value (EDWARDS_0161) | | |

| | | | |
|---|---|---|---|
| 25 | Photograph of Ms. Edwards' home (EDWARDS_0175) | | |
| 26 | Yavapai Title Agency, Inc. Payment Summary (EDWARDS_0165-0166) | | |
| 27 | Nelnet Payoff Summary as of 1/27/2015 (CA#000026) | X | |
| 28 | IBR Repayment Plan Request dated July 20, 2012 (CA#000067-000076) | X | |
| 29 | IBR Application, dated October 24, 2013 (EDWARDS_0033-0039) | X | |
| 30 | Nelnet Loan Servicing Borrower History (CA#000002-000023) | X | |
| 31 | Nelnet Disclosure of Repayment Schedule "Group C" dated 1/29/2014 (CA#000049-000050) | X | |
| 32 | Nelnet Disclosure of Repayment Schedule "Group D" dated 1/29/2014 (CA#000051-000052) | X | |
| 33 | Payment receipts (EDWARDS_00440051) | | |
| 34 | Nelnet Deferment/Forbearance History (CA#000024-000025) | X | |
| 35 | Economic Hardship Deferment Request dated 7/20/2012 (CA#000093) | X | |
| 36 | Faxed request dated 7/4/2011 (CA#000082-000083) | X | |
| 37 | Faxed request dated 2/22/2011 (CA#000070-000081) | X | |
| 38 | Forbearance Application dated 2/22/2011 (CA#000085-000087) | X | |
| 39 | Economic Hardship Deferment Request dated 12/16/2010 (CA#000090-000092) | X | |
| 40 | Forbearance Application dated 2/11/2010 | | |
| 41 | Plaintiff's Forbearance Summary | | |
| 42 | Email correspondence regarding Social Service Director Interview (EDWARDS_0060-0061) | | |
| | Any exhibit provided by Defendant | | |
| | Any exhibit required for impeachment | | |
| | Any relevant document that becomes available between now and the date set for trial. | | |

**B. Defendant's Exhibit List**

| No. | Summary | Stip. | Obj. |
|---|---|---|---|
| A | Plaintiff's Responses to Defendant College Assist's First Set of Interrogatories, Requests for Admission, and Requests for Production of Documents | X | |
| B | Nelnet Disclosure of Repayment Schedule for Income-Based Repayments (CA#000041-000053) | | |
| | College Assist reserves the right to use as an exhibit at trial any document yet to be provided by Plaintiff pertaining to Plaintiff's income, assets, and/or expenses | | |
| | College Assist reserves the right to use as an exhibit at trial any exhibit needed for rebuttal or impeachment | | |

DATED this 10th day of December, 2015.

**ZWILLINGER GREEK & KNECHT PC**

By: s/ Michael W. Zimmerman

Michael W. Zimmerman
2425 E. Camelback Rd., Suite 600
Phoenix, Arizona 85016
*Attorneys for Rita Gail Edwards*

**TAYLOR ANDERSON, LLP**

By: s/ Kyle Seedorf

Kyle Seedorf
1670 Broadway, Suite 900
Denver, Colorado 80202
*Attorneys for College Assist*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 10th day of December, 2015, I caused the foregoing document to be filed electronically with the Clerk of Court through ECF; and that ECF will send an e-notice of the electronic filing to:

The following ECF participants:

Kyle Seedorf
Taylor Anderson, LLP
1670 Broadway, Suite 900
Denver, Colorado 80202
kseedorf@talawfirm.com

s/ Rachel V. Cruz

ZGLAWDM-#1111105-v3