1

2

3

4

5

6 **UNITED STATES BANKRUPTCY COURT**

7 **DISTRICT OF ARIZONA**

| | | |
|---|---|---|
| In re | ) | Chapter 7 Proceedings |
| | ) | |
| **RITA GAIL EDWARDS**, | ) | Case No: 3:14-bk-16806-PS |
| | ) | |
| Debtor. | ) | Adversary No. 3:15-ap-26-PS |
| _____ | ) | |
| **RITA GAIL EDWARDS**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **UNDER ADVISEMENT ORDER** |
| v. | ) | |
| | ) | |
| **EDUCATIONAL CREDIT** | ) | |
| **MANAGEMENT CORPORATION**, | ) | (Not for Publication) |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

18      Before this Court is the complaint of Plaintiff, Rita Gail Edwards ("Debtor"), to

19 determine the dischargeability, under 11 U.S.C. § 523(a)(8),[1] of student loans owed by

20 Debtor to Defendant, Educational Credit Management Corporation ("ECMC" or

21 "Defendant"), in the amount of $243,506.35.[2]  The Court now finds Debtor's obligations

22 to Defendant are wholly dischargeable.[3]

---

[1]  Unless otherwise indicated, all Chapter, Section and Rule references are to the Bankruptcy Code ("Code"), 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

[2]  This aggregate balance is claimed by Defendant to be owed as of December 11, 2015.  While Debtor does not agree with this amount, this issue is not contested by Debtor in this Adversary Proceeding.

[3]  This Order sets forth the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

# I. BACKGROUND

## A.  Procedural History

Debtor filed her voluntary chapter 7 bankruptcy petition on November 10, 2014 ("Petition Date").  She filed her Schedule F reflecting an unsecured, undisputed obligation to Defendant's predecessor-in-interest in the amount of $227,499.00 (Administrative Docket Number ("Adm. DE") 22).  On January 12, 2015, Plaintiff commenced this adversary proceeding with the filing of her Complaint (DE 1)[4] to determine the dischargeability of Debtor's student loans.  An Answer was filed on February 12, 2015 (DE 11).  Defendant Nelnet Loan Servicing was replaced as a party Defendant by the State of Colorado, Department of Higher Education, Colorado Student Loan Program dba College Assist ("College Assist") by order of the Court dated March 5, 2015 (DE 18).  Defendant U.S. Department of Education was dismissed from this Adversary Proceeding on April 14, 2015 (DE 28).  Defendant College Assist was replaced by ECMC as party defendant, pursuant to this Court's order of January 16, 2016 (DE 53).

The parties filed their Joint Pretrial Statement ("JTPS") (DE 42) on December 10, 2015.  On January 19, 2016, the Court entered its order (DE 54) approving the parties' agreed motion (DE 49) to amend the JTPS.  On February 16, 2016, the Court held a trial on this matter.  At the conclusion of the trial, the Court took this matter under advisement.

## B.  The Evidence

Two witnesses testified at trial:  Jennifer Skerbinc and Debtor.

1.      Jennifer Skerbinc.  Ms. Skerbinc is a Litigation Specialist for ECMC.  She testified that the amount owed by Debtor to Defendant totaled $245,327.  She reviewed Debtor's adjusted gross income, as reflected in Debtor's 2015 federal tax return

---

[4]  DE shall hereafter refer to docket entries in the adversary file in this case.

(Exhibit 8)[5]. Ms Skerbinc then reviewed the "REPAYE" and Income Based Repayment ("IBR") student loan repayment programs. Both of these student loan repayment programs call for an annual review of an obligor's income and expenses. Absent such proof, each program assumes a 5% annual increase in the obligor's earnings. Both "programs" call for a 25 year repayment program and both call for forgiveness of indebtedness of an obligor's student loans if she successfully completes 25 years of payments. The primary differences between these two programs are that the IBR program requires proof of the obligor's hardship and calls for payment of 15% of the obligor's discretionary income. The REPAYE program requires no proof of hardship and calls for payment of 10% of obligor's discretionary income.

Based on Debtor's presumed 2015 adjusted gross income of $30,622, Ms. Skerbinc testified that Debtor's initial payments under the REPAYE program would be $56 per month but would be $84 per month for the first 12 months under the IBR program.

2.    <u>Rita Gail Edwards</u>.  Debtor is an intelligent, well-spoken, 56-year-old single woman with two adult children.  The eldest, Regina Sebert, is a 34-year-old single woman who suffers from type 1 diabetes, a disease which has caused blindness, failing kidneys, and a failing pancreas. She lives on her own and receives $844 per month in public assistance, which amount is insufficient to cover her living expenses and medical needs.  Debtor's other child is Seth Sebert, a 32-year-old transwoman known as "Asia." Asia is a convicted felon, has bipolar disorder, post-traumatic stress and a host of other maladies.  Asia has lived with Debtor since November 2014, but has spent the bigger end of the past 15 years in correctional institutions.  Although Asia receives food stamps, she has been denied disability benefits.  However, Debtor is hopeful that Asia's disability appeal will reverse this denial.  According to Debtor, Asia is intelligent but is

---

[5] It is the Court's understanding that this tax return, while signed by the Debtor on January 11, 2016, had not been filed as of the date of the trial.

so debilitated by her numerous psychological challenges that, for the foreseeable future, she is not likely to produce any meaningful support for herself or her mother's household. The father of Regina and Asia died in 1990.

Debtor has three degrees from Ottawa University, in Secondary Education (B.A. 1996), Education (Masters 2000) and Professional Counseling (Masters 2002). The student loans at issue were obtained to pay for Debtor's education and living expenses while pursuing these degrees at Ottawa.

Debtor's post-graduate employment includes jobs in education and various forms of counselling for wages ranging from $16 to $28 per hour. Debtor and her then husband both lost their jobs during the recession in 2009. In 2009, Debtor formed a sole proprietorship named SET Counselling ("SET") which provides a host of counselling services in Northern Arizona. Her tax returns from 2010 to 2014 reflect annual income ranging from $26,625 to $638 for an average annual income of $14,157.80. In 2015, Debtor generated adjusted gross income of $30,622. At the time of trial, Debtor's monthly take home income was generally about $2,200 per month and her expenses were around $2,500 per month.[6] Defendant challenges the reasonableness of certain expenses of the Debtor including recreation ($50 per month), term insurance ($27) and two payments ($403 per month) related to her 2015 purchase of a 2006 Toyota with 115,000 miles. One of the car loans calls for a monthly payment of $153 to an arm's-length creditor but another $250 per month is due to Debtor's mother and step-father who, post-petition, released their lien against a vehicle Debtor traded in so she could acquire the Toyota. Debtor has approximately 1.5 years of payments left on each of these loans.

. . .

---

[6] While the JTPS reflects an agreed gross income of $2,840 per month for the past six months and expenses of $2,504 per month, the Debtor's testimony made it clear that these figures failed to include her income tax bills of about $600 per month.

Debtor has applied for numerous jobs in the past four years, to no avail. Her SET employment enables her to be relatively close to her children so she can attend to their needs while also providing the flexibility to take them to medical appointments and provide for their other daily demands. Regina, of course, cannot drive. Debtor receives no governmental aid nor does she receive income from any source beyond her work with SET.[7]

Debtor's student loans were consolidated in 2006 after which time she requested and obtained several forebearances. See Exhibits 31 (dated December 16, 2010) , 32 (dated February 13, 2010) and 34 (dated February 22, 2011). Debtor made loan payments on her student loans in 2011 (at least four, totaling $143.47), 2012 (at least 9, totaling $201.39), 2013 (at least 13, totaling $333.40) and 2014 (at least 7, totaling $179.62) for an aggregate of at least 33 payments totaling $857.88. Although Debtor made these loan payments, she failed to pay her income taxes between 2012 and 2015. She now owes unpaid taxes in excess of $16,000, a portion of which she is repaying at the rate of $150 per month.

Debtor lives with Asia in a tiny mobile home in Cornville, Arizona. She bought this mobile home for $37,500 in April 2011 and pays $494 per month towards the mortgage. Prior to acquiring the mobile home, she lived for two years in a 20-year-old fifth wheel trailer with her then husband. At her current residence she sometimes turns off the water heater for several months at a time in order to trim expenses. Debtor has no health insurance but is being assessed for health insurance under the Affordable Health Care Act. Although her 2015 tax return (Exhibit 8) has apparently not yet been filed, she expects it will produce an additional federal tax bill in excess of $6,000.[8]

. . .

---

[7] Debtor has been divorced twice but neither former spouse pays her support of any kind. Asia does receive food stamps totaling $190 per month.

[8] This amount is part of the $16,000 tax debt referred to above.

## II. JURISDICTION

This adversary proceeding is a core matter over which the Court has jurisdiction. 28 U.S.C. §§ 157(B)(2)(1) and 1334.

## III. ISSUE

Has Debtor proven by a preponderance of the evidence that her student loans owed to Defendant are to be wholly or partially discharged under § 523(a)(8) of the Code?

## IV. LAW

Section 523(a) of the Code states in relevant part, as follows:

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt— . . .
> (8) unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for—
> (A)(i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or
> (ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or
> (B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual;

Although § 523(a)(8) references "undue hardship," that term is not defined in the Code. The Southern District of New York announced its definition of undue hardship in *Brunner*, 46 B.R. 752 (S.D.N.Y. 1985) (Aff'd by 831 F.2d 395(2nd Cir. 1987)). The Ninth Circuit, in turn, adopted *Brunner's* three-prong undue hardship test in the case of *In re Pena*, 155 F.3d 1108 (9th Cir. 1998).

The *Brunner* test is as follows:

1. The Debtor is not presently capable of maintaining a "'minimal' standard of living for herself and her dependents if forced to repay the [student] loans." *Brunner*,

831 F.2d at 396;

2. "That additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans." *Id.*; and

3. "That the debtor has made good faith efforts to repay the [student] loans . . . ." *Id.*

Debtor "bears the burden of proving by a preponderance of the evidence, all of the" three prongs of the *Brunner* test. *In re Birrane*, 287 B.R. 490, 494 (9th Cir. B.A.P. 2002). *See also In re Refino*, 245 F.3d 1083, 1087 (9th Cir. 2001).

Discharge litigation under § 523(a)(8) is not necessarily a winner-takes-all proposition. "Bankruptcy courts may exercise their equitable authority under § 105(a) to partially discharge student loans." *In re Jorgensen*, 479 B.R. 79, 86 (9th Cir. B.A.P. 2012); *see also In re Saxman*, 325 F.3d 1168, 1173 (9th Cir. 2003). The Court's discretion extends to both the amount discharged and the repayment terms for the undischarged portion. *Jorgensen*, 479 B.R. at 86. However, even if the student loan discharge is partial, the Debtor still must satisfy all three prongs of the *Brunner* test. *Id.* and *Saxman*, 325 F.3d at 1174.

**A.** *Brunner* **Prong No. 1 – Minimal Standard of Living**

To satisfy the first prong of the *Brunner* test, Debtor must demonstrate more than that she is experiencing tight finances. *In re Nascimento*, 241 B.R. 440, 445 (9th Cir. B.A.P. 1999). "In defining undue hardship, courts require more than temporary financial adversity but typically stop short of utter hopelessness." *Id.*

**B.** *Brunner* **Prong No. 2 – Additional Circumstances**

In describing the second prong of the *Brunner* test, the Ninth Circuit B.A.P. has noted:

> Additional circumstances are any circumstances beyond the more current inability to pay, that show the inability to repay is likely to persist for a significant portion of the repayment period. *In re Nys*, 308 B.R. at 444. "The circumstances need be 'exceptional' only in the sense that they demonstrate insurmountable barriers to the debtor's financial recovery and ability to pay." *Id.* A court may consider a number of factors not limited to the following: the debtor's age, training, physical and mental health, education, assets, ability to obtain a higher paying job or reduce expenses. *Id.*

*Jorgensen*, 479 B.R. at 88. The "additional circumstances" test is, "by its nature, case-by-case." *Nys*, 308 B.R. 436, 444 (9th Cir. B.A.P. 2004) aff'd 446 F.3d 938 (9th Cir. 2006). The *Nys* court cites a non-exclusive list of twelve factors to review in determining whether a debtor has satisfied the second prong of the *Brunner* test:

1. Serious mental or physical disability of the debtor or the debtor's dependents which prevents employment or advancement; *Brunner*, 831 F.2d at 396;
2. The debtor's obligations to care for dependents; *Id.*;
3. Lack of, or severely limited education; *Pena*, 155 F.3d at 1114;
4. Poor quality of education[9];
5. Lack of usable or marketable job skills; *Birrane*, 287 B.R. at 497;
6. Underemployment;
7. Maximized income potential in the chosen educational field, and no other more lucrative job skills;
8. Limited number of years remaining in work life to allow payment of the loan; *Brunner*, 831 F.2d at 396;
9. Age or other factors that prevent retraining or relocation as a means for payment of the loan;
10. Lack of assets, whether or not exempt, which could be used to pay the loan;
11. Potentially increasing expenses that outweigh any potential appreciation in the value of the debtor's assets and/or likely increases in the debtor's income;
12. Lack of better financial options elsewhere.

---

[9] *See Pena*, 155 F.3d at 1114 (educational training for a job in an over-saturated market); *Cota*, 298 B.R. at 418 (school's incompetency); *Speer v. Educ. Credit Mgmt. Corp* (*In re Speer*), 272 B.R. 186, 187 (Bankr. W.D. Tex. 2001) (trade school had improperly trained debtor and few graduates obtained jobs).

*Nys* at 446-447.

## C. *Brunner* Prong No. 3 – Good Faith

In reviewing the third prong of the *Brunner* test, the Ninth Circuit B.A.P. has stated that:

> To determine good faith, the court measures the debtor's efforts to obtain employment, maximize income, minimize expenses, and negotiate a repayment plan. *In re Mason*, 464 F.3d 878, 884 (9th Cir. 2006). Whether a debtor made payments prior to filing for discharge is also a persuasive factor in determining whether she made a good faith effort to repay her loans. *In re Pena*, 155 F.3d at 1114.

*In re Jorgensen*, 479 B.R. at 89.

In his concurring opinion in *In re Roth*, 490 B.R. 908, 920-923 (9th Cir. B.A.P. 2013) Judge Pappas acknowledges that courts in the Ninth Circuit are bound by *Brunner* and *Pena* but makes impassioned and persuasive arguments as to why the Ninth Circuit should revisit this outdated test. Loyola Law School Prof. Anne Wells takes up Judge Pappas' torch and provides further background into the history of student loan dischargeability policies, statutes, case law and changed conditions in the market place. Ann E. Wells, <u>Replacing Undue Hardship With Good Faith: An Alternative Proposal for Discharging Student Loans in Bankruptcy</u>, 33 Cal. Bankr. J. 313-344 (2016). Among other things, Prof. Wells notes that, as of March 13, 2015, student loan debt in the United States totaled more than $1.25 trillion. *Id.* This amount is more than the combined national debts of Austria and Belgium. *Id.* At the end of 2012, Americans in their 50's owed $112 billion and those in their 60's owed $43 billion. *Id.* at 319. In short, student loan debt is a gigantic issue in the United States, and not just for students in their 20's.

. . .

. . .

# V. ANALYSIS

### A. <u>Minimum Standard of Living</u>

At present, Debtor is not just living hand to mouth, she is barely eeking out an existence. She lives in a tiny mobile home in a small but affordable Northern Arizona town. Her vehicle, while apparently serviceable, is an old high mileage compact car. Debtor does not live an extravagant life. She periodically shuts off her water heater in an effort to reduce expenses.

Defendant criticizes several of Debtor's monthly expenditures (e.g., recreation, term insurance and car payments). This Court, however, finds each of these expenses to be reasonable under the Debtor's circumstances. Debtor's term insurance provides an appropriate safety net for her children should Debtor pass away. The insurance premiums are nominal ($27 per month). Debtor's $50 per month entertainment expenses are hardly lavish. Debtor's car payments reflect the fact that she could not afford to buy a car for cash, that she had an outstanding balance on her trade-in, and that two lien payments were necessary to acquire the Toyota Corolla. Despite her efforts to minimize expenses, Debtor has been unable to timely pay her income tax bills. Debtor cannot presently maintain a minimal standard of living if she were forced to repay her student loans.

Debtor's financial difficulties are not merely a temporary state of affairs. Debtor's tax returns since 2010 reveal the prolonged nature of her financial hardship. These returns do not reveal that her two children have long suffered from their current ailments and both are dependent upon financial assistance which their mother supplies. For quite some time in the past and for the foreseeable future could not and will not be able to maintain a minimal standard of living if she were forced to repay her student loans.

. . .

**B. "Additional Circumstances"**

This Court will address the second prong of the *Brunner* test by walking through the twelve steps program announced by the Ninth Circuit B.A.P. in *Nys*.

    1.   <u>Disabilities of Debtor or Her Dependents</u>. The Debtor is not physically or emotionally handicapped. In view of her monumental life challenges, this Court was impressed by how diligent, stable and well-adjusted she appeared to the Court. That said, Debtor is very restricted by the demands of motherhood and the realities of her income earning potential. Although Regina receives some state assistance, it is not enough to cover her cost of care. Debtor has for years been supplementing Regina's modest revenue and will need to continue doing so for the remainder of her life. As to Asia, at present, she appears to be wholly dependent upon her mother's income. Asia may be physically capable of performing some level of work but this Court was persuaded by Debtor's credible testimony to the effect that Asia is so affected by psychological issues that she is not likely to generate any meaningful income for a long time, maybe for the rest of her life. Regina's and Asia's conditions do not prevent Debtor from working but their needs have inhibited and will continue to inhibit Debtor's working hours and geographical location.

    2.   <u>Caring for Dependents</u>. See paragraph 1, above.

    3.   <u>Educational Limitations</u>. Debtor is well educated. For years she has been actively employed in her field of education. However, under the very best of circumstances, Debtor's education would not likely qualify her for a lucrative salary. The Court finds Debtor is making a reasonable level of income with the education and training she has acquired.[10]

. . .

---

[10] The more puzzling question is how Debtor ever qualified for $250,000 in student loans to pursue a course of study that was never likely to enable her to produce sufficient income to service her student loans. This, of course, is part of the student loan crisis addressed in Prof. Wells' article and Judge Pappas' concurrence referenced above.

4.  <u>Quality of Education</u>.  Debtor holds one undergraduate and two graduate degrees from Ottawa University.  Ottawa is not exactly a name brand university but this Court was not supplied with evidence which would enable the Court to criticize the merits of the education supplied by this non-profit university.

5.  <u>Job Skills</u>.  Debtor has usable and marketable job skills but there is a limit to the earning capacity these skills can produce.  Debtor could admittedly make more money in a bigger market place (e.g. Phoenix), but her expenses would also increase dramatically.  Moreover, Debtor would not be in a position to care for her dependent[11] children as she is presently.

6.  <u>Underemployment</u>.  Debtor is somewhat underemployed at present.  She does, however, periodically apply for regional jobs as they become known to her.  Her underemployment is through no fault of her own.  Nor, as Defendant suggests, has Debtor chosen to do less than she is capable of doing in the workplace.

7.  <u>No More Lucrative Job Skills</u>.  Debtor is and has long been actively employed in her chosen educational field.  She is not likely to earn more anytime soon, especially since she must care for her two children.  Unfortunately, Debtor does not possess other skills which would qualify her for more lucrative employment in another discipline.

8.  <u>Work Years Remaining</u>.  Debtor is 56 years old, a year younger than the author of this opinion.  While some would say the 50's are the new 40's, we all know otherwise.  Debtor likely has another eight years of maximum earning potential and maximum job performance.  Our culture has long pegged age 65 as the logical retirement age.  This Court anticipates Debtor will likely retire at 65.  The student loan repayment programs discussed by defendant's witness, Ms. Skerbinc, call for a 25-year

---

[11]  Although Regina cannot be claimed as a dependent for tax purposes, this Court finds she is nevertheless materially (albeit partially) dependent on her mother's care and income.

payment regimen.[12]

9.    Retraining Prospects.    Debtor is already highly trained and skilled in her chosen field.    To suggest she change careers at age 56 is not reasonable.    More importantly, piling on additional student loan debt would be the Debtor's only means of acquiring new skills.    Accumulating more student loans is the last thing Debtor needs. Devoting one to three more years in study would also be unwise if Debtor has only eight working years left in her.

10.    Lack of Assets.    Debtor owns a very modest home, a well-worn vehicle and an education that produces a minimal standard of living.    She lacks the assets or means to pay all or even most of her student loans.

11.    Increasing Expenses.    Debtor has done a remarkable, even heroic, job trimming her expenses.    There is no evidence that her mobile home will appreciate in value but this Court is well aware that Cornville has long been a sleepy rural community and that 600 sq. ft. mobile homes do not generally appreciate, nor do 10-year old Toyota Corollas.

12.    Lack of Better Options Elsewhere.    As noted in section V(B)(5) above, Debtor could and likely would earn more in a major metropolitan area, if a 56-year old woman could find the right job.    However, her living expenses would also increase and she would likely need to find and pay for a replacement caregiver for Regina.    Debtor is also convinced that the distractions of a bigger city will cause Asia to once again find herself in trouble with the law.    Phoenix surely does hold a greater number of distractions than does Cornville.

In hindsight, it is a shame that Debtor ever incurred these student loan debts. While her Ottowa University education may have given her the tools and credentials to

---

[12] Even if Debtor were required to adhere to a 25-year repayment schedule (a prospect this Court finds unreasonable to expect of a 56-year old woman), the discharge she could receive under these programs would leave her with significant debt forgiveness income. *See Roth*, 490 B.R. at 923.

work in an emotionally satisfying role and may have provided a well needed skilled counselor in her rural community, the predictable economic reward was never likely to justify the massive economic burden she incurred. Debtor, of course, is not blameless in this regard. She signed these loan obligations and promised to pay the balances. However, she was married and may very well have reasonably anticipated a different overall financial future for her and her family.

In summary, Debtor does not satisfy each and every one of the twelve *Nys* factors, but she does satisfy most of them. This Court finds that additional circumstances do exist in Debtor's life such that her grim financial circumstances are likely to persist for the remainder of her life. Short of acquiring a winning Powerball ticket, this Court finds the Debtor's dire financial straits will persist through and beyond the date she turns 65.

**C. Debtor's Good Faith Repayment Efforts**

Since the student loans at issue were consolidated in 2006, Debtor made at least 33 payments on these loans. One could call these payments nominal but they were in accordance with her agreement with Defendant's predecessor(s) and those payments were in accordance with her financial means. Significantly, while Debtor was making these student loan payments, she was unable to pay her income taxes. She now owes $16,000 in non-dischargeable tax debt. Debtor should not be forced to repay her student loans if doing so causes her to amass unpaid income tax liability. Debtor has satisfied the third prong of the *Brunner* test.

Defendant notes in the JTPS at page 22, that Debtor's home loan will be fully matured in 2021,[13] assuming she does not refinance or buy a replacement home before then. Debtor will be 62 years old at that time. Her $494 monthly payment may then be concluded but it is not unreasonable to believe she will need to commit that monthly

---

[13] This is not a stipulated fact under the JTPS nor does the Court recall this "fact" being introduced into evidence.

financial freedom to other obligations, including deferred maintenance to the mobile home, a newer car, etc.

## VI. CONCLUSION

Debtor has satisfied her burden of proof on each of the three *Brunner* tests. Moreover, this Court concludes a partial discharge is not appropriate under the circumstances as this Court finds that Debtor does not, and most likely will not, have the capacity to repay any portion of her student loans. The Court, therefore, wholly discharges the student loans at issue under 11 U.S.C. § 523(a)(8).

**So ordered.**

Dated: March 31, 2016

_____
DANIEL P. COLLINS
UNITED STATES BANKRUPTCY JUDGE

COPY of the foregoing mailed by the BNC to:

Interested Parties